# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

EVA CORKER,

     Plaintiff

v.

ANDREW SAUL,
Commissioner of
Social Security Administration,

     Defendant

Case No.: 3:20-cv-00138-WGC

**Order**

Re: ECF Nos. 25, 28

     Before the court is Plaintiff's Motion for Reversal and/or Remand. (ECF No. 25.) The Commissioner filed a Cross-Motion to Affirm and Opposition to Plaintiff's motion. (ECF Nos. 28, 29.)

     After a thorough review, and for the reasons set forth below, Plaintiff's motion is granted; the Commissioner's cross-motion is denied; and this matter is remanded for further administrative proceedings consistent with this order.

## I. BACKGROUND

     On or around June 14, 2016, Plaintiff completed applications for disability insurance benefits (DIB) under Title II of the Social Security Act and for supplemental security income (SSI) under Title XVI of the Social Security Act, alleging disability beginning October 15, 2015. (Administrative Record (AR) 216-226.) The applications were denied initially and on reconsideration. (AR 153-156, 160-165.)

     Plaintiff requested a hearing before an administrative law judge (ALJ). (AR 166.) ALJ Janice Shave held a hearing on January 31, 2019. (AR 36-92.) Plaintiff, who was not represented

by counsel, appeared and testified on her own behalf at the hearing. Testimony was also taken from a vocational expert (VE). On April 10, 2019, the ALJ issued a decision finding Plaintiff not disabled. (AR 10-28.) Plaintiff requested review, and the Appeals Council denied the request, making the ALJ's decision the final decision of the Commissioner. (AR 1-9.)

Plaintiff then commenced this action for judicial review under 42 U.S.C. § 405(g). Plaintiff argues that the ALJ erred by failing to evaluate the mental health opinion evidence consistent with Agency policy and Ninth Circuit precedent. The Commissioner, on the other hand, argues that the ALJ relied on the three medical opinions regarding Plaintiff's mental health in making her findings, and properly gave the opinions of other sources and non-medical opinions little to no weight because they were inconsistent with the record.

## II. STANDARDS

**A. Disability Process**

"The Social Security Administration (SSA) provides benefits to individuals who cannot obtain work because of a physical or mental disability." *Biestek v. Berryhill,* 139 S.Ct. 1148, 1151-52 (2019). A claimant may apply for disability insurance benefits (DIB) under Title II of the Social Security Act, and/or supplemental security income (SSI) benefits under Title XVI of the Act. SSI benefits are based on need, and to be eligible a claimant must be "aged, blind or disabled" and have income and resources under certain thresholds. 42 U.S.C. § 1382(a). DIB are based on earnings, and the claimant must be disabled and have contributed to the insurance trust fund through deductions in wages. 42 U.S.C. § 401(b). DIB, unlike SSI, are limited to a certain period of insurance determined by the amount of the claimant's previously taxed earnings.

42 U.S.C. § 423(c)(1). Title 20 of the Code of Federal Regulations contains SSA's regulations. Those that start with 404 are Title II regulations. Those that start with 416 are Title XVI regulations.

After a claimant files an application for disability benefits, a disability examiner at the state Disability Determination agency, working with a doctor(s), makes the initial decision on the claimant's application. *See* 20 C.F.R. §§ 404.900(a)(1); 416.1400(a)(1). If the agency denies the claim initially, the claimant may request reconsideration of the denial, and the case is sent to a different disability examiner for a new decision. *See* 20 C.F.R. §§ 404.900(a)(2), 416.1400(a)(2). If the agency denies the claim on reconsideration, the claimant may request a hearing and the case is sent to an ALJ who works for the Social Security Administration. *See* 20 C.F.R. §§ 404.900(a)(3), 416.1400(a)(3). The ALJ issues a written decision after the hearing. *See* 20 C.F.R. § 404.900(a)(3). If the ALJ denies the claim, the claimant may request review by the Appeals Council. *See* 20 C.F.R. §§ 404.900(a)(4), 416.1400(a)(4). If the Appeals Council determines there is merit to the claim, it generally remands the case to the ALJ for a new hearing. If the Appeals Council denies review, the claimant can file an action in the United States District Court. *See* 42 U.S.C. § 405(g); 20 C.F.R. §§ 404.900(a)(5), 416.1400(a)(5).

**B. Five-Step Evaluation of Disability**

Under the Social Security Act, "disability" is the inability to engage "in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). A claimant is disabled if his or her physical or mental impairment(s) are so severe as to preclude the claimant from doing not

only his or her previous work but also, any other work which exists in the national economy, considering his age, education and work experience. 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step sequential process for determining whether a person is disabled.  20 C.F.R. §404.1520 and § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). In the first step, the Commissioner determines whether the claimant is engaged in "substantial gainful activity"; if so, a finding of nondisability is made and the claim is denied. 20 C.F.R. § 404.152(a)(4)(i), (b); § 416.920(a)(4)(i); *Yuckert*, 482 U.S. at 140. If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to step two.

The second step requires the Commissioner to determine whether the claimant's impairment or combination of impairments are "severe." 20 C.F.R. § 404.1520(a)(4)(ii), (c) and § 416.920(a)(4)(ii), (c); *Yuckert*, 482 U.S. at 140-41. An impairment is severe if it significantly limits the claimant's physical or mental ability to do basic work activities. *Id*. If the claimant has an impairment(s) that is severe, the Commissioner proceeds to step three.

In the third step, the Commissioner looks at a number of specific impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listed Impairments) and determines whether the claimant's impairment(s) meets or is the equivalent of one of the Listed Impairments. 20 C.F.R. § 404.1520(a)(4)(iii), (d) and § 416.920(a)(4)(iii), (d). The Commissioner presumes the Listed Impairments are severe enough to preclude any gainful activity, regardless of age, education or work experience. 20 C.F.R. § 404.1525(a), § 416.925(a). If the claimant's impairment meets or equals one of the Listed Impairments, and is of sufficient duration, the claimant is conclusively presumed disabled. 20 C.F.R. § 404.1520(a)(4)(iii), (d), § 416.920(a)(4)(iii), (d). If the claimant's impairment is severe, but does not meet or equal one of the Listed Impairments, the Commissioner proceeds to step four. *Yuckert*, 482 U.S. at 141.

1    At step four, the Commissioner determines whether the claimant can still perform "past

2 relevant work." 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f) and § 416.920(a)(4)(iv), (e), (f). Past

3 relevant work is that which a claimant performed in the last 15 years, which lasted long enough

4 for him or her to learn to do it, and was substantial gainful activity. 20 C.F.R. § 404.1565(a) and

5 § 416.920(a).

6    In making this determination, the Commissioner assesses the claimant's residual

7 functional capacity (RFC) and the physical and mental demands of the work previously

8 performed. *See id.;* 20 C.F.R. § 404.1520(a)(4)(v), § 416.920(a)(4)(v); *see also Berry v. Astrue*,

9 622 F.3d 1228, 1231 (9th Cir. 2010). RFC is what the claimant can still do despite his or her

10 limitations. 20 C.F.R. § 404.1545 and § 416.945. In determining the RFC, the Commissioner

11 must assess all evidence, including the claimant's and others' descriptions of the limitation(s),

12 and medical reports, to determine what capacity the claimant has for work despite his or her

13 impairments. 20 C.F.R. § 404.1545(a)(3) and  416.945(a)(3).

14    A claimant can return to previous work if he or she can perform the work as he or she

15 actually performed it, *i.e.*, if he or she can perform the "actual functional demands and job duties

16 of a particular past relevant job," or as generally performed, *i.e.*, "[t]he functional demands and

17 job duties of the [past] occupation as generally required by employers throughout the national

18 economy." *Pinto v. Massanari*, 249 F.3d 840, 845 (9th Cir. 2001) (internal quotation marks and

19 citation omitted). If the claimant can still do past relevant work, then he or she is not disabled.

20 20 C.F.R. § 404.1520(f) and § 416.920(f); *see also Berry*, 62 F.3d at 131.

21    If, however, the claimant cannot perform past relevant work, the burden shifts to the

22 Commissioner to establish at step five that the claimant can perform other work available in the

23 national economy. 20 C.F.R. §§ 404.1520(e), 416.920(e); *see also Yuckert*, 482 U.S. at 141-42,

144. This means "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." *Gutierrez v. Comm'r of Soc. Sec. Admin.*, 740 F.3d 519, 528 (9th Cir. 2014). The Commissioner must also consider the claimant's RFC, age, education, and past work experience to determine whether the claimant can do other work. *Yuckert*, 482 U.S. at 141-42. The Commissioner may meet this burden either through the testimony of a VE or by reference to the Grids. *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999).[1]

If at step five the Commissioner establishes that the claimant can do other work which exists in the national economy, then he or she is not disabled. 20 C.F.R. § 404.1566(b), § 416.966(b). Conversely, if the Commissioner determines the claimant unable to adjust to any other work, the claimant will be found disabled. 20 C.F.R. § 404.1520(g), § 416.920(g); *see also Lockwood v. Comm'r Soc. Sec. Admin.*, 616 F.3d 1068, 1071 (9th Cir. 2010); *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th Cir. 2009).

**C. Judicial Review & Substantial Evidence**

The court must affirm the ALJ's determination if it is based on proper legal standards and the findings are supported by substantial evidence in the record. *Gutierrez*, 740 F.3d at 522 (citing 42 U.S.C. § 405(g)). "Substantial evidence is 'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 523-24 (quoting *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012)).

---

[1] "The grids are matrices of the four factors identified by Congress—physical ability, age, education, and work experience—and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy." *Lockwood v. Comm'r of Soc. Sec. Admin.*, 616 F.3d 1068, 1071 (9th Cir. 2010) (internal quotation marks and citation omitted).

To determine whether substantial evidence exists, the court must look at the record as a whole, considering both evidence that supports and undermines the ALJ's decision. *Gutierrez*, 740 F.3d at 524 (citing *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001)). The court "'may not affirm simply by isolating a specific quantum of supporting evidence.'" *Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007)). "'The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities.'" *Id*. (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)). "If the evidence can reasonably support either affirming or reversing, 'the reviewing court may not substitute its judgment' for that of the Commissioner." *Gutierrez*, 740 F.3d at 524 (quoting *Reddick v. Chater*, 157 F.3d 715, 720-21 (9th Cir. 1996)). That being said, "a decision supported by substantial evidence will still be set aside if the ALJ did not apply proper legal standards." *Id*. (citing *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009); *Benton v. Barnhart*, 331 F.3d 1030, 1035 (9th Cir. 2003)). In addition, the court will "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Garrison*, 759 F.3d at 1010 (citing *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003)).

### III. DISCUSSION

**A. ALJ's Findings in this Case**

At step one, the ALJ found Plaintiff met the insured status requirements through December 31, 2020, and had not engaged in substantial gainful activity since the alleged onset date of October 15, 2015. (AR 16.)

At step two, the ALJ concluded Plaintiff had the following severe impairments: anxiety, post-traumatic stress disorder (PTSD), dissociative identity disorder (DID), and complex sleep

apnea consisting of moderate obstructive sleep apnea, mild central sleep apnea and nocturnal hypoxemia. (AR 16.)

At step three, the ALJ determined Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the Listed Impairments. (AR 18-19.)

At step four, the ALJ assessed Plaintiff as having the RFC to perform a full range of work at all exertional levels, with the following non-exertional limitations: she can never climb ladders, ropes or scaffolds, and must avoid concentrated exposure to unprotected heights and hazardous or moving machinery due to the effects of medications; she is not capable of interaction with the public; she is capable of occasional, non-team interaction with co-workers; she is able to understand, remember, and carry out mildly detailed instructions up to a maximum specific vocational preparation (SVP) of 3, but cannot perform work directing others; she would be off-task up to 10 percent of the day in addition to regular breaks (averaging up to six minutes per hour); she is capable of no more than average production standards; she is able to perform mildly detailed tasks in a work environment free of fast-paced production requirements with no directing of others, and only occasional non-team interaction with others; and she would be absent, tardy, or depart early one-half day two times a month. (AR 21.)

The ALJ then concluded Plaintiff was capable of performing her past relevant work as a "gluer." (AR 25-26.)

At step five, the ALJ made an alternative determination, based on VE testimony, that considering Plaintiff's age, education, work experience and RFC, there were jobs that exist in significant numbers in the national economy that Plaintiff could also perform, including: laundry

laborer and hospital cleaner. (AR 26-27.) As a result, the ALJ found Plaintiff not disabled from October 15, 2015, through the date of the decision. (AR 28.)

**B. Mental Health Opinion Evidence**

**1. Standard**

"Courts 'distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physician); and (3) those who neither examine nor treat the claimant (nonexamining physicians).'" *Garrison*, 759 F.3d at 1012 (quoting *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)).

The Social Security Administration amended its regulations regarding the evaluation of medical evidence for claims filed on or after March 27, 2017, so that there is no longer a hierarchy for treating, examining or non-examining sources for those cases. *See* 20 C.F.R. § 404.1520c(a), 416.920c(a). This claim was filed before March 27, 2017; therefore, the new regulations are not applicable. For claims filed before March 27, 2017, 20 C.F.R. §§ 404.1527 and 416.927 govern how an ALJ must weigh medical evidence. Those regulations afford "treating sources" controlling weight in certain circumstances. *See also* Social Security Ruling (SSR) 96-2p, 1996 WL 374188 (July 2, 1996).[2] Even when the treating sources are not given controlling weight, they are still entitled to deference. *Id*.

The Ninth Circuit has similarly held that "[a]s a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (citation and quotation marks omitted).

---

[2] SSRs are "final opinions and orders and statements of policy and interpretations" issued by the Commissioner. 20 C.F.R. § 402.35(b)(1). Although they do not have the force of law, in the Ninth Circuit they are given deference "unless they are plainly erroneous or inconsistent with the Act or regulations." *Quang Van Han v. Bowen*, 882 F.2d 1453, 1457 (9th Cir. 1989).

"[T]he opinion of a treating physician is thus entitled to greater weight than that of an examining physician, [and] the opinion of an examining physician is entitled to greater weight than that of a non-examining physician." *Id.* (citation omitted). "If a treating physician's opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [it will be] given controlling weight." *Ghanim v. Colvin*, 763 F.3d 1154, 1160 (9th Cir. 2014) (citation and quotation marks omitted); *see also Revels v. Berryhill*, 874 F.3d 648, 854 (9th Cir. 2017) (citing 20 C.F.R. § 404.1527(c)(2)). "The weight afforded a non-examining physician's testimony depends on the degree to which [he or she] provide[s] supporting explanations for [his or her] opinions." *Garrison*, 759 F.3d at 1012 (citation and quotation marks omitted).

"To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citation omitted). To reject a treating or examining doctor's opinion that is contradicted by another doctor's opinion, the ALJ must "provid[e] specific and legitimate reasons that are supported by substantial evidence." *Garrison*, 759 F.3d at 1012 (citation and quotation marks omitted). "Where an ALJ does not explicitly reject a medical opinion or set forth specific legitimate reasons for crediting one medical opinion over another, he errs." *Garrison*, 759 F.3d at 1012 (emphasis added).

For claims filed before March 27, 2017, an "other source," such as a social worker or therapist, may provide evidence to be considered in evaluating a disability claim. 20 C.F.R. § 404.1513(d)(1). An ALJ must provide "reasons germane to each witness" to discount "other source" evidence. *Molina v. Astrue*, 674 F.3d 1104, 1111-12 (9th Cir. 2012) (citing *Turner v. Comm'r of Soc. Sec. Admin.*, 613 F.3d 1217, 1224 (9th Cir. 2010)).

### 2. Mental Health Evidence and Opinions

Plaintiff has a long history of mental health issues stemming from physical and sexual abuse at the hands of her parents, until she left home when she was 17, and then again in various relationships as an adult. She has been diagnosed with DID, depression, PTSD, and anxiety. She suffers from insomnia, and has sleep apnea. She also has a substance abuse history, but has been clean since 1992.

On October 20, 2015, she saw Tilda Martin, APRN, and reported she was recently laid off from her job which was causing her increased stress and suicidal thoughts. She was referred to psychology. (AR 407-08.) In October and November, she still had anxiety and was nervous, and also had symptoms of depression. (AR 405, 407.) On January 11, 2016, she complained of depression and anxiety. (AR 401.) On February 5, 2016, Stephen Nicholas, LCSW, described Plaintiff as having extreme levels of anxiety and similar levels of physical pain that affected her ability to work and her life possibilities. (AR 444.)

Plaintiff was admitted to the Carson Tahoe emergency room on February 18, 2016, after she made comments at the Dayton Mental Health Facility of suicidal ideation. She clarified she had suicidal thoughts, but had no plan to harm herself because she had a teenage daughter. She was discharged without being placed on a legal hold. (AR 370-373.) She saw Stephen Nicholas, LCSW, for several months after that. (AAR 441-443, 436-437, 439-440.) When she saw APRN Martin again on March 9, 2016, for a follow up after her visit to the emergency room, she was anxious and requested a referral to psychology. (AR 400.)

Plaintiff had an assessment by Bodie Coates in connection with her application for Temporary Assistance for Needy Families (TANF). Coates described Plaintiff as having a moderate risk for harm and moderate functional impairment. Plaintiff struggled with depression,

anxiety, and PTSD. She had a depressed mood, low energy, racing thoughts, loss of interest or pleasure, feelings of worthlessness and excessive guilt, difficulty concentrating and was easily distracted, with extreme highs and lows in her mood. Plaintiff would often dissociate, especially when she was in pain, and the dissociation lead to her being incapable of managing most things in her life. Her PTSD had been very intense, resulting in suicidal thoughts. She had a significant trauma history and demonstrated anxious, depressed, and dissociative symptoms. She did not want to take psychiatric medications due to her substance abuse history. She was described as "average functioning for someone with her abuse history and mental health concerns." She reported that she dissociates through most of the day, and has ongoing flashbacks that result in her being incapable of performing throughout the day. (AR 421-27.)

She then began seeing a new therapist, Michael Elterman, MA, LCPC. He described her DID as a chronic condition, and on May 23, 2016, she was "incapacitated" as she experienced triggering episodes at least two to three times a day with unpredictable timing. It was unlikely her condition would require inpatient care. He opined that she could not perform work because she was hypervigilant due to severe childhood abuse and would often dissociate (meaning her mind would be somewhere else), and some of her dissociations were reliving the abuse. (AR 449.)

Plaintiff also began seeing psychiatrist Elizabeth Haase, MD, CTPC. Dr. Haase described Plaintiff as having symptoms of anxiety and depression, and when things got very bad she would become catatonic for months, sitting at home, dissociated, and unable to focus on real events, in a depressed and panicked state. She would wait for a window of energy to shop or do basic cleaning in her home. On examination, Plaintiff was poorly groomed, and appeared older than her age, in dirty clothing and with poor dentition. She was agitated with distracted. She dissociated, but was overall goal directed with some childlike moments. She had constant suicidal ideation for years.

She engaged in avoidance, and had a depressed mood and affect, with panic symptoms, but no frank psychosis. She was assessed with DID as well as bipolar disorder with the current episode described as depressed and severe, but without psychotic features. Dr. Haase recommended treatment of her mood and dissociation with Lamictal. (AR 447-48.)

On July 20, 2016, Tiffani Lindsay, MD, MFT, LADC, stated that Plaintiff participated in counseling with her office in January and February of 2016, focusing on her struggles with anxiety, depression and suicidal thoughts that were consistent with a diagnosis of PTSD, which made it very difficult for her to manage the demands of daily life. (AR 451.)

On October 24, 2016, Plaintiff had a consultative examination with Robert Wildman, Ph.D. Dr. Wildman indicated Plaintiff reported she had difficulty concentrating and with her memory, troubling thoughts, is anxious and depressed, which could be severe, as well as suicidal thoughts, but no current plan to harm herself. She had a somewhat depressed mood, and presented herself as being in a mild to moderate degree of ongoing emotional distress. She acknowledged entering into dissociative states, which Dr. Wildman found were clearly related to her PTSD. Her memory was not significantly impaired. He diagnosed her with PTSD associated with depression.

Plaintiff reported to Dr. Wildman that she did not sleep well; was able to dress and bathe herself; she could perform household chores including cooking, running errands, shopping and driving; however, she felt her activities were limited to two hours at a time due to her depression and dissociation. She said she related to others in a "fair" manner. At that point, she could do a little housekeeping.

Dr. Wildman opined Plaintiff could understand, remember and carry out simple and detailed and sometimes mildly complex instructions; she was mildly impaired in her ability to interact appropriately with co-workers, supervisors and the public; and she was moderately

impaired in her ability to maintain attention and concentration which limited her to detailed (and not complex) tasks. He concluded her financial affairs should be overseen by professional personnel until her level of anxiety was brought under better control. In discussing her prognosis, Dr. Wildman stated that hopefully Plaintiff would continue to work with professionals and make continued improvements. (AR 461-65.)

On November 2, 2016, Plaintiff underwent an evaluation by Denise Weber, LSW, in connection for her reapplication for TANF. Plaintiff reported flooding past traumatic memories that made it difficult for her to lead a normal lifestyle, and she felt overwhelmed by these painful past memories. During her interviews, she was nervous and extremely anxious and had to stop several times to regroup and continue. In the beginning, Plaintiff would mostly call Ms. Weber, but had started to only e-mail to avoid contact with people, and slightly regressed because she did not want to meet in her home. Plaintiff suggested they meet at a Starbucks because her home was her only "safe place." This was her "safe zone" where only the most trusted people could enter without her feeling out of her body and going into extreme dissociation. Nevertheless, there was a home visit in June of 2016, but Plaintiff was very nervous about this, and it took her several days to stop feeling suicidal after the home visit. Ms. Weber opined that based on her psychosocial assessment, home visit and multiple interactions with Plaintiff, her mental health issues prevent her from obtaining and maintaining employment. (AR 274.)

R. Torigoe, Ph.D. evaluated Plaintiff's mental health disability claim at the initial level, and Joseph Ceniti evaluated Plaintiff's mental health limitations on reconsideration. Neither examined Plaintiff. Both completed a mental health RFC, opining that Plaintiff: had no limitations in her memory or ability to understand; had sustained concentration and persistence limitations; could carry out short and simple instructions, as well as detailed instructions; was moderately limited in

her ability to maintain concentration and attention for extended periods; could maintain regular attendance and be punctual within customary tolerances; could sustain an ordinary routine; could work in coordination with or proximity to others; was moderately limited in her ability to complete a normal workday/week without interruptions from psychologically-based symptoms and could perform at a consistent pace without an unreasonable number and length of rest periods; is capable of work without strict production standards; and had no social interaction limitations. (AR 102-03, 133-34.)

On August 23, 2017, Mr. Elterman described Plaintiff as being fearful of starting any medication because of her substance abuse history and fears it would jeopardize her sobriety. He noted that Plaintiff would not even walk down aisles with alcohol in them and she stays away from pharmacies. She recently refused pain medication after all of her upper teeth were pulled for these reasons. He also stated that long term, individual psychotherapy is the treatment of choice for DID. He opined that Plaintiff's depression was reasonably under control, her suicidal thoughts were well managed; however, he did not believe at this stage in her recovery that she was capable of employment. (AR 521.)

On September 3, 2017, Mr. Elterman completed a work capacity evaluation for Plaintiff. He opined Plaintiff is moderately impaired in her ability to remember locations and work-like procedures, noting this was difficult because Plaintiff dissociates and then has difficulty with concentration. She is slightly impaired in her ability to understand and remember short and simple instructions. He noted that she knows how to write things down and when she has detailed instructions she could follow them. He believes she is markedly impaired in her ability to carry out detailed instructions because she could only do so with a lot of effort if she writes down the instructions very carefully. She is moderately impaired in her ability to maintain and

concentrate for extended periods. He noted that because of her dissociative states and emotional

pain maintaining attention and concentration for more than a couple of hours, this has been

almost impossible for her (she gets fatigued after focusing on things for an  hour).

He went on to opine that she is moderately impaired in her ability to perform activities

within a schedule, and in maintaining regular attendance and being punctual within customary

tolerances, indicating that her ability to perform activities within a schedule would actually be

between marked and extremely limited. He said that she is slightly impaired in her ability to

sustain an ordinary routine without special supervision. She is, however, extremely impaired in

her ability to work in coordination with or proximity to others without being distracted. He

explained that while in proximity to others, even while shopping, she becomes distracted and

even panicked, depending on the level of noise and social contact, and this often causes her to

leave wherever she is and she has to return after she has calmed down.

He concluded that she can make simple work decisions. She is extremely impaired in her

ability to interact appropriately with the general public. She is moderately limited in her ability to

ask simple questions or request assistance, but has marked impairment in the ability to accept

instructions and respond appropriately to criticism from supervisors. She is slightly impaired in

her ability to get along with coworkers or peers without distracting them or exhibiting behavioral

extremes. She is markedly limited in her ability to maintain socially appropriate behavior, noting

that if exposed to more than one person at a time (and sometimes only one) she would easily

become rattled and leave, and when criticized she would probably initially react appropriately

but then would turn and walk away and become suicidal. She is moderately limited in her ability

to respond appropriately to changes in the work setting, indicating that when things change she

becomes lost and feels stressed. She is markedly limited in her ability to travel to unfamiliar

places. Finally, he noted that it is important to realize that because of her trauma she is constantly in a state of dissociation, varying in degree. (AR 522-24.)

On September 14, 2017, Dr. Haase indicated Plaintiff had moderately severe depression. She noted that Plaintiff had many depressive symptoms and struggled with pain, and was unable to keep up all aspects of self-care and spent most of the time in her house. She also remained "profoundly suicidal." Plaintiff was sleeping four to six hours a night, experiencing many nightmares and panic attacks. After a discussion about medication, Plaintiff indicated her willingness to try lithium for her symptoms. On examination, Plaintiff was anxious, tense and isolated with gaze avoidance; she looked older than her staged age; she became overwhelmed and tearful but then was able to regain her composure in the interview. Her mood was sad and tearful with a congruent affect. She did have high intelligence and good psychological mindedness and reasoning. Dr. Haase described her as "continu[ing] to do poorly." She was started on lithium. (AR 526.)

On September 20, 207, Mr. Elterman noted that Plaintiff was also diagnosed with chronic fatigue fibromyalgia, as well as DID and PTSD and major depression stemming from severe abuse. He indicated that Plaintiff wanted to be in the workforce, but her condition prevented her from being able to focus and attend on a predictable basis. Throughout the day and night she has flashbacks of her abuse, resulting in her becoming dissociative in order to survive, and this would severely interfere with any employment. He said that when her PTSD symptoms present at work, she would lose focus, dissociate and become "someone else," which would be disruptive to the workplace. He felt that her entering the workforce at this time would be "psychologically damaging," and would possibly lengthen the time before she could successfully enter the workplace again. (AR 527-28.)

On January 12, 2018, Dr. Haase described Plaintiff as having moderate depression, and she felt about one third better after being on the lithium. She reported being irritable, and had low energy, insomnia, and an impaired ability to remember basic things, and poor productivity. Dr. Haase discussed with Plaintiff the role that "profound sleep apnea" may be having on her daytime symptoms, but also said that they could not rule out that her depression was worsening on lithium. (AR 542-43.)

Mr. Elterman completed a comprehensive mental health evaluation on May 1, 2018. Plaintiff became immediately dissociated, and still had suicidal ideations daily. She had symptoms of chronic PTSD, which often resulted in dissociation. Her PTSD and dissociative states and depression prevented her, on a daily basis, from performing even simple tasks of daily living. She was still having disturbed sleep, even with the use of the BiPap machine for her apnea. She was hypervigilant when stressed, and detaches from reality. She also suffered from anxiety symptoms due to her significant trauma history. It was difficult to determine the severity because she was in a dissociative state, which he said in itself was revealing about her anxiety level. She had a short attention span and was distracted easily. She had mood swings and when she was doing well she would let people in, but when her mood and demeanor change she withdraws, and these things happen most of the day. She had cooperative but guarded behavior, with an appropriate affect, but a depressed, anxious and irritable mood. She had coherent thought processes and above average intellect, and no impairment in her memory. She had fair judgment. (AR 551-57.)

On June 19, 2018, Dr. Haase described her as overall doing somewhat better. She reported Plaintiff had some cleaning jobs for several hours in the morning, but Plaintiff included a note in her record that she would attempt to clean at home, but did not have any "jobs."

Plaintiff was very irritable and "more negative than usual." She had a low mood with low frustration tolerance. Her insight and judgment were good. Her sleep apnea was dramatically improved, and her functionality was overall improved "although still very limited." (AR 572-74.)

Dr. Haase noted on September 13, 2018, that they were trying to attempt to stabilize Plaintiff's sleep apnea, but she was continuing to have obstructive and central apneas that led to fatigue and increased mood problems. (AR 576.)

On January 15, 2019, Plaintiff reported to Dr. Haase she was doing "slightly less well" than the previous month. She had nausea, palpitations, sweating and increased fatigue. She did have a continued decrease in suicidal thinking. On examination, Plaintiff continued to be loud and somewhat brusque at times, and was anxious of being mistreated. She had improving organization in her life. Her judgment was outstanding in her attempts to help herself. Her mood continued to be anxious with a congruent affect, and was somewhat constricted overall. She had a tendency toward vigilance, with high levels of startle and feeling overwhelmed. There was no evidence of malingering for secondary gain. She was doing slightly better each time with continued difficulties achieving normal sleep quality and oxygenation. She had increasing insight into her dissociative system and its function, which allowed her to be better connected to day-to-day events, although this was highly stressful. Overall, however, Dr. Haase said that Plaintiff remained limited to four hours of activity per day. (AR 650-51.)

**3. ALJ's Findings**

The ALJ accorded significant, but not full weight, to the opinions of the psychological consultative examiner (Dr. Wildman) and the State agency mental health consultants. She found that their opinions were generally consistent in that they all assessed Plaintiff as having moderate limitation in attention and concentration, but found some differences in the degree of specific

1  function by function limitations. The ALJ said that the opinions were generally reasonable and

2  supported by the record as a whole, but no single assessment was completely adopted as the

3  RFC. (AR 23.)

4        The ALJ then assigned little weight to the assessments of licensed social worker Denise

5  Weber, who opined Plaintiff had episodes of incapacity because her mental health issues

6  prevented her from obtaining and maintaining employment. (*Id*.) The ALJ noted that Ms. Weber

7  primarily mentioned Plaintiff's subjective complaints, which the ALJ found generally not

8  consistent with the record as a whole. In addition, the ALJ concluded that Ms. Weber's

9  functional assessment was not consistent with the evidence in the record, or with the mental

10 status examinations that showed mostly normal findings. The ALJ also determined that

11 Ms. Weber's findings were not consistent with the conclusions from her own evaluation, and

12 specifically, findings that Plaintiff went out in public and had an organized home. Finally, the

13 ALJ found that Plaintiff's admitted activities of daily living from around the same period,

14 including managing her finances, going out alone, shopping, socializing with others, and getting

15 along with authority figures, were not consistent with Ms. Weber's opinion.

16       The ALJ likewise gave little weight to the disability statements from Plaintiff's counselor,

17 Mr. Elterman. The ALJ found that Mr. Elterman's opinions were conclusory and not adequately

18 supported by clinical findings. In addition, the ALJ determined that Mr. Elterman appeared to

19 rely on Plaintiff's subjective complaints, which the ALJ found were generally not consistent with

20 the record, and the opinions were contradictory to the evidence showing Plaintiff's mental status

21 was essentially normal. The ALJ also stated that Mr. Elterman did not appear to consider the

22 extensive activities of daily living reported by Plaintiff.

23

1   The ALJ also considered the opinions of Ms. Coates, Ms. Lindsay, and Dr. Haase. The

2   ALJ found that these opinions appeared to rely on Plaintiff's subjective complaints, and ignored

3   the admitted activities of daily living, including her admission that she drives, goes out alone,

4   manages her finances, attends to her personal care, and provides care for her daughter. The ALJ

5   also determined that their opinions were not consistent with the objective evidence in the record

6   showing Plaintiff reported her condition improved with ongoing treatment, and the opinions

7   were not consistent with mostly normal mental status evaluations. (AR 25.)

8       **4. Analysis**

9       The ALJ gave the following reason for rejecting the opinions of Ms. Weber,

10   Mr. Elterman, Ms. Coates, Ms. Lindsay and Dr. Haase: (1) they relied on Plaintiff's subjective

11   complaints that were not consistent with the record; (2) they were inconsistent with the record

12   that showed normal mental status examinations; (3) they ignored or were inconsistent with her

13   activities of daily living. In addition, the ALJ said that Mr. Elterman's opinions were conclusory.

14       First, insofar as the ALJ rejected these opinions because they were based on Plaintiff's

15   subjective complaints, the Ninth Circuit has held that psychiatric evaluations should not be

16   rejected simply because they are based on a claimant's self-reports. *Buck v. Berryhill*, 869 F.3d

17   1040, 1049 (9th Cir. 2017). Psychiatric "[d]iagnoses will always depend in part on the patient's

18   self-report, as well as on the clinician's observations of the patient. But such is the nature of

19   psychiatry." *Id.* (citing *Poulin v. Bowen*, 817 F.2d 865, 873 (D.C. Cir. 1987) ("[U]nlike a broken

20   arm, a mind cannot be x-rayed.")). "Thus, the rule allowing an ALJ to reject opinions based on

21   self-reports [that applies in other medical fields] does not apply in the same manner to opinions

22   regarding mental illness." *Id.* In *Buck,* the Ninth Circuit noted that the examining source

23

conducted a clinical interview and mental status evaluation of the claimant, which were

"objective measures [that] cannot be discounted as a 'self-report.'" *Id.* at 1049.

Plaintiff's mental health providers also conducted clinical interviews and mental status

evaluations. As such, the fact that they relied on Plaintiff's subjective complaints, by itself, is not

a sufficient reason to reject the opinions of Plaintiff's psychological providers.

The court will now determine whether the ALJ set forth other sufficient reasons,

supported by substantial evidence, for rejecting these opinions.

The ALJ discounted Mr. Elterman's opinions as conclusory, but a review of his

statements reveal they are anything but conclusory. Even when filling out "check-the-box"

forms, Mr. Elterman included detailed statements to support his selections. This is more than the

undersigned usually sees in support of these forms, and he also gave much greater descriptions

than the non-examining psychological consultants, who opined Plaintiff had fewer limitations.

Therefore, the court finds that this was not a sufficient basis for rejecting Mr. Elterman's

opinions.

Next, the ALJ gave little weight to these opinions because she found that they were

inconsistent with the objective record that included normal mental status examinations.

Tilda Martin, APRN, noted that Plaintiff was nervous and anxious, yet described her as

having a normal mood, affect, behavior, judgment, and thought content; however, she still

referred Plaintiff to psychology for her depression and anxiety after she reported suicidal

thoughts in the past. (AR 407-09.) Roughly a week later, APRN Martin also described Plaintiff

again as anxious and nervous, and positive for depression, and said Plaintiff should consider

medication. (AR 405-07.) At an employment physical on November 30, 2015, Plaintiff was

described as having normal mood, affect, behavior, judgment and thought content. (AR 403.)

APRN Martin assigned this same description to Plaintiff on December 14, 2015. (AR 402.) On January 11, 2016, however, Plaintiff was still complaining of depression and anxiety, and described her long history of abuse. Plaintiff had an anxious mood, but normal behavior, judgment and thought content. She was encouraged to consider an anti-depressant and to follow through with individual therapy. (AR 400-401.)

On February 5, 2016, Stephen Nicholas, LCSW, said Plaintiff had "extreme" levels of anxiety that affected her ability to work and life possibilities. (AR 444.) She was subsequently admitted to the emergency room after making comments of suicidal ideation. While she had clear speech, and good insight and judgment, the provider did describe her as having a long history of dissociative disorder and depression secondary to significant abuse. (AR 371-372.)

When she saw APRN Martin for a follow up, she was nervous and anxious, but had a normal mood and affect as well as behavior and judgment; however, she was referred to psychiatry given her long history of psychological issues stemming from "severe" abuse. (AR 399-400.) Plaintiff reported an increase in her stress at her next visit with ARPN Martin. (AR 398.)

Ms. Coates performed a comprehensive assessment, noting that Plaintiff struggled with depression, anxiety, PTSD and multiple personality disorder, as well as suicidal ideation. She described Plaintiff as often dissociating, which led to her being incapable of managing most things in her life. She also suffered from significant anxiety and depressive symptoms. Nevertheless, Plaintiff was cooperative, and had fair judgment, normal speech, but an anxious mood. Ms. Coates commended that Plaintiff reported that she dissociated through most of the day, and had ongoing flashbacks that would result in her being incapable of performing throughout the day. (AR 422-27.)

On April 8, 2016, Plaintiff was described as meeting the definition for "severe emotional distress and serious mental illness." (AR 417.)

On May 23, 2016, she was noted as having chronic DID, and at that time was "incapacitated." She had trigger episodes that occurred at least two to thee times a week, with unpredictable timing. She could not perform work because of her dissociations. (AR 449.) Dr. Haase described her as poorly groomed, looking older than her stated age with poor dentition, and was agitated, distracted and dissociated, though overall she was goal-directed. She engaged in avoidance, and had a depressed mood and affect, as well as panic symptoms but no frank psychosis. (AR 447.)

When she saw Dr. Wildman, she had a somewhat depressed mood and appeared to have a mild to moderate degree of ongoing emotional distress, with suicidal thoughts and feelings. He also indicated that she would enter into dissociative states that were related to her PTSD.

Ms. Weber indicated that during her interviews, Plaintiff was very nervous and needed coaching and encouragement to calm her down, and she was extremely anxious and had to stop several times to regroup and continue.

On September 14, 2017, Dr. Haase noted Plaintiff had moderately severe depression, with many depressive symptoms. She described Plaintiff as anxious, tense and with gaze avoidance. She was groomed, and in baggy dress. She became overwhelmed and tearful but later regained her composure. Her mood was sad and tearful, with a congruent affect, though she had high intelligence and good psychological mindedness and reasoning. Dr. Haase said that Plaintiff continued to do poorly. On January 12, 2018, Dr. Haase noted Plaintiff had depression, was irritable, had low energy, insomnia, and poor productivity. On examination, Plaintiff was anxious, loud, distraught with lesser eye contact and mild agitation. She was distracted and upset

with a low mood and was mostly dysphoric. She was positive for dissociation. Her insight and judgment, however, were fair to good.

When she saw Mr. Elterman on May 1, 2018, she had a depressed mood with low energy and fatigue, and had suicidal thoughts but not present plan. She had normal motor skills, cooperative but guarded behavior and appropriate affect. She was depressed and anxious with an irritable mood, but coherent though process. She had fair judgment.

On June 19, 2018, Dr. Haase said she was overall doing somewhat better, but also described her as irritable, impatient and more negative than usual. She had a low mood with a low frustration tolerance. Her affect was somewhat associated with rapid shifts. Her insight and judgment were good. On January 15, 2019, Dr. Haase described Plaintiff as doing "slightly less well." She was loud and somewhat brusque, as well as anxious, but had outstanding judgment. Her mood was anxious with a congruent affect, and was somewhat constricted overall, with a tendency toward vigilance and high levels of startle. She was doing slightly better, but overall, she was still limited to four hours of activity per day.

The foregoing demonstrates that while Plaintiff had some "normal" mental status examination findings, the majority of the findings by those tasked with evaluating her psychologically were not "normal," and were, in fact, consistent with their opinions. Therefore, the ALJ's statement that these providers' opinions were inconsistent with mostly normal mental status exams is not supported by substantial evidence in the record.

Finally, the ALJ rejected these opinions because she found them inconsistent with Plaintiff's reported daily activities, including that she goes out alone, shops, drives, attends to her personal care, provides care for her daughter, manages her finances, and socializes with others.

Dr. Haase noted that after Plaintiff got laid off, she spent almost three months being dysfunctional, and would have to wait for a window of energy and optimism to shop or doing basic chores around the house.

Ms. Lindsay stated that Plaintiff struggled with anxiety, depression, and suicidal thoughts, as well as PTSD, which made it difficult for her to manage the demands of daily life. (AR 451.)

Dr. Wildman indicated that Plaintiff could eat well, but did not sleep well; she could dress and bathe herself and performed household chores, but acknowledged reported she could do these things for two hours at a time due to her depression and dissociation and lack of energy. She had no hobbies, but she could. (AR 464.)

Ms. Weber noted that Plaintiff no longer called because she wanted to avoid contact with people, and also did not want to meet Weber in her home because that was her only safe place. After Weber did go to her home for one appointment, it took several days for Plaintiff to stop feeling suicidal.

Plaintiff filled out a fatigue questionnaire, where she stated that her difficulty sleeping made it difficult for her to do household chores, and she would need to rest after doing chores for 15 minutes. (AR 316.)

Mr. Elterman said that Plaintiff works on things for about an hour and then cannot go on to finish tasks until later because she is so fatigued after focusing for that long. He also said that when she is in proximity to others, even while shopping, she becomes distracted and even panicked, depending on the level of noise and social contact. This often causes her to leave the store or wherever she is, and she has to return after calming down. In addition, she becomes easily rattled when exposed to more than one person at a time.

1    On September 14, 2017, Dr. Haase noted that Plaintiff was unable to keep up all aspects

2  of self-care, including showering and cleaning, and she spent most of her time in her house.

3    In June of 2018, Dr. Haase noted Plaintiff would do some cleaning jobs for several hours

4  in the morning, but would spend the rest of the day on the couch. Plaintiff clarified that she did

5  not have "jobs," but tried to do household chores at home. (AR 572.)

6    Plaintiff testified she lives with her daughter, and she does drive. (AR 45-46.) She does

7  grocery shopping. She does some laundry and cooking, but they mostly eat meals that are frozen

8  and already prepared and her daughter warms up her own meal. She never goes to social events,

9  and does not go out. (AR 57-58.) If she vacuums, it is not in one day, but over weeks. If she

10  cleans the dishes, she does so when she can. (AR 58.) She has minimal contact with others.

11  (AR 66-67.)

12    In her adult function report, she indicated she does laundry once a week. (AR 266.) She

13  makes mostly prepared foods. She cleans every now and then, with the help of her daughter.

14  (AR 267.)

15    In her disability report appeal, she said that even driving was hard to do because of her

16  fatigue, which also made it hard to keep up with basic chores, which she would do in increments.

17  (AR 323-324.) She has to rest for up to an hour or more in between chores until she has more

18  energy. She does trips to the grocery store quickly, and goes in the early morning hours when the

19  store opens and there are hardly any customers. (AR 329.) Taking a shower is a huge task, and

20  she has to wait until she has the energy. She has no social life at all. (AR 330.)

21    The Ninth Circuit has said that the fact that a claimant can participate in some activities

22  does not contradict evidence of otherwise severe problems encountered in daily life. *Diedrich v.*

23  *Berryhill*, 874 F.3d 634, 643 (9th Cir. 2017). Being able to do some household chores, cooking

simple meals, self-grooming, paying bills and occasional shopping are not similar to typical work responsibilities. *Id*. In *Diedrich*, the court noted that anxiety related to social interaction can make a task that is easy to perform inside the home potentially very difficult to perform outside the home. *Id*.

In *Revels v. Berryhill*, 874 F.3d 648 (9th Cir. 2017), the ALJ discounted the claimant's credibility because she could use the bathroom, brush her teeth, wash her face, take her children to school, wash dishes, do laundry, sweep, mop and vacuum, cook, shop, get gas and feed her dogs. *Id*. at 667-68. The Ninth Circuit found that the ALJ failed to acknowledge the claimant's explanation that she could only complete some of the tasks in a single day, and regularly needed to take breaks, which the court found was consistent with her symptom testimony. *Id*. at 668. The court reiterated that a claimant does "not need to be utterly incapacitated in order to be disabled." *Id*. at 667.

In Garrison, the ALJ pointed to the claimant's activities of talking on the phone, preparing meals, cleaning her room and helping to take care of her daughter. *Garrison*, 759 F.3d at 1015. Similar to *Revels*, the Ninth Circuit found that the ALJ erred in ignoring the claimant's testimony that she was assisted in performing many of those activities, that her pain regularly prohibited her from engaging in the activities, and that she needed to rest after performing the activities. *Id*. at 1016.

This is the type of situation the Ninth Circuit cautioned against in *Revels* and *Garrison*. The ALJ did not explain how being able to do these few things was inconsistent with her mental health providers' findings. Moreover, she ignored Plaintiff's qualifications that accompanied her statements about her activities: that she did things in smaller increments, that she needed to rest

in between activities, and that she went to the store at a time when she could avoid being around a lot of people.

Therefore, the ALJ's decision to reject these providers' opinions because they were inconsistent with Plaintiff's daily activities is not adequately supported by the record.

## IV. CONCLUSION

The ALJ erred in failing to give legally sufficient reasons for rejecting the opinions of Plaintiff's psychological treating and examining providers. Plaintiff does not ask for a reversal and remand for calculation of benefits. Instead, Plaintiff asks for a remand for "a rehearing, i.e., for further administrative proceedings." Therefore, the court will remand this matter for further administrative proceedings before the ALJ, so that the ALJ may properly consider the opinions of Plaintiff's treating and examining psychological providers in determining whether Plaintiff is disabled.

Plaintiff's motion (ECF No. 25) is **GRANTED.** The Commissioner's cross-motion (ECF No. 28) is **DENIED**. This matter is **REMANDED** for further administrative proceedings consistent with this Order.

The Clerk shall enter judgment accordingly.

IT IS HEREBY ORDERED

Dated: March 9, 2021

William G. Cobb
United States Magistrate Judge